[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14996
_____

D. C. Docket No. 1:09-cv-01152-AT

COYOTE PORTABLE STORAGE, LLC,
DESERT PORTABLE STORAGE, LLC,
CACTUS PORTABLE STORAGE, LLC,

Plaintiffs – Appellees,

versus

PODS ENTERPRISES, INC.,
as successor in interest to PODS, Inc.,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 8, 2015)

Before MARTIN, Circuit Judge, and RESTANI,* Judge, and HINKLE,** District
Judge.

_____

    * Honorable Jane A. Restani, Judge for the United States Court of International Trade,
sitting by designation.
    ** Honorable Robert L. Hinkle, United States District Judge for the Northern District of
Florida, sitting by designation.

HINKLE, District Judge:

This is a dispute over the meaning of two royalty provisions in a series of franchise agreements. We conclude that the first disputed provision is ambiguous. The contemporaneous documentary evidence makes clear beyond dispute that the representatives who negotiated the provision on both sides had the same understanding of the provision's meaning; we construe the provision as they understood it. The second disputed provision is clear, as both sides agree even now. We apply the provision as written, rejecting the franchisor's contention that the provision was included in the agreements only through a scrivener's error. Finally, we reject the franchisor's assertion that the franchisees' claims are barred by a release or lack of notice.

I

Some might say PODS, Inc. built a better mousetrap: a system for moving from one residence to another without the time constraints that ordinarily attend the process. A traditional moving van must be promptly loaded, driven to the destination, and promptly unloaded. Otherwise the customer incurs substantial extra charges; the van and its crew are the traditional moving company's stock in trade and cannot be kept idle. If the new residence is not ready when the old one must be vacated, the customer's furniture and household goods must be loaded, transported, unloaded, stored, and then loaded and unloaded again. A pod, in

contrast, can be left unattended at the customer's location or stored. So a customer can have a pod loaded or can load it at the customer's convenience over time, can have the pod stored (without unloading it) if the new residence is not ready when the old one must be vacated, and can have the pod unloaded or can unload it at the customer's convenience. There is no need for a second loading and unloading.

"PODS" is an acronym for portable on demand storage. PODS, Inc., has now been succeeded by PODS Enterprises, Inc., the defendant in the district court and appellant here. This opinion uses "PODS" as a reference to either.

When PODS began its business, the focus was on local moving and storage; moving from one city to another became a focus only later. PODS established franchises in local markets. The plaintiffs in the district court—the appellees here—are three franchisees under common ownership: Coyote Portable Storage, LLC ("Coyote") with operations in Phoenix; Desert Portable Storage, LLC ("Desert") with operations in Las Vegas; and Cactus Portable Storage, LLC ("Cactus") with operations in Tucson.

PODS entered franchise agreements with Coyote and Desert on September 29, 2003. The agreements were identical to one another and identical in most respects to PODS's standard franchise agreement. But PODS did not insist that franchisees accept its standard agreement. Here there were negotiations that resulted in changes set out in an addendum to each agreement. PODS entered a

3

franchise agreement with Cactus on June 15, 2004, again with an addendum altering the standard agreement as a result of arm's length negotiations.

Under the agreements, PODS was entitled to royalties calculated as a minimum amount each month or, if greater, a specified percentage of the franchisee's "net sales." Customers ordinarily remitted payments to PODS, who withheld royalties (and other appropriate amounts) and remitted the balance to the franchisee. The first issue on this appeal is whether "net sales" included only revenues from local operations—the primary source of revenues at the time—or also included revenues from moves between separate franchised territories. The parties have sometimes referred to revenues from nonlocal moves as "cross-country," "inter-franchise," or "I-F" revenues. This opinion ordinarily refers to them as "cross-country revenues."

PODS periodically evaluated its franchisees. The standard franchise agreement provided an incentive for satisfactory performance that became applicable only after the franchisee had been in operation for three years: the base royalty was 10% but a separate term provided a 2% rebate for a satisfactory rating. The Coyote, Desert, and Cactus addendums all changed the base royalty to 8% but allowed PODS to increase this to 10% for unsatisfactory performance. The Cactus addendum deleted the separate term providing a 2% rebate for satisfactory performance, so with satisfactory performance, Cactus's royalty was 8%, as both

4

sides agree.  The Coyote and Desert addendums did not delete the separate term providing a 2% rebate.  The second issue on this appeal is whether that term remained applicable, that is, whether, with a satisfactory rating, the effective royalty for Coyote and Desert was 6% or 8%.  The issue arose when the Cactus agreement was being negotiated—Cactus asked for the same 6% effective royalty Coyote and Desert had received, but PODS said that was a mistake.

In June 2007, the parties entered a second addendum to the Coyote and Desert franchise agreements changing PODS's option to purchase the franchisee's assets.  Neither the option nor the change is at issue here.  But each franchisee's second addendum included a general release.

In January 2008, Coyote, Desert, and Cactus formally notified PODS of the claims they now assert: the claim to the return of royalties withheld based on cross-country revenues and, for Coyote and Desert, the claim to a 2% rebate for satisfactory performance.  Coyote and Desert asserted claims only from July 2007 forward, recognizing that their general releases barred claims for earlier periods. PODS rejected the claims.

The claims implicate two provisions of the franchise agreements not addressed to this point.  First, the agreements include a choice-of-law provision: Florida law controls.  All parties agree the provision is binding.  Second, the agreements include a provision requiring a franchisee to give PODS notice within

5

12 months after it learns or should learn of a breach and, "except as otherwise prohibited or limited by applicable law," barring any claim for which timely notice was not given.

## II

On April 30, 2009, Coyote, Desert, and Cactus filed this action in the Northern District of Georgia based on diversity jurisdiction. The only claims still at issue are common-law contract claims—claims for the return of the royalties PODS exacted based on cross-country revenues (count 1), for the disputed 2% rebates (count 2), for a declaratory judgment on these issues (count 9), and for attorney's fees under the franchise agreements' prevailing-party fee provisions (count 12). The district court granted summary judgment for the franchisees and awarded damages and attorney's fees. PODS brings this appeal.

We review de novo the district court's summary-judgment ruling, see, e.g., Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005), and its interpretation of the franchise agreements, see, e.g., Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1065 (11th Cir. 2004).

## III

Each franchise agreement includes two back-to-back definitions of "net sales." They could be exhibit A in a law-school class on bad drafting. The first definition is a 139-word sentence fragment. The second is a 58-word "which"

6

clause in the agreement's next sentence.  The fragment and the "which" clause

each apparently attempts to set out a complete definition of "net sales" that could

stand alone.  The back-to-back definitions are set out here in their entirety:

> "Net sales" – The aggregate amount of sales, revenues, fees, charges and other consideration actually received for services and products sold in connection with operations conducted by the Franchised Business including income derived from sales at or away from the Franchised Business but excluding: (a) all federal, state and municipal sales or service taxes collected from customers and paid to the appropriate authority; (b) all insurance billed to and collected from customers and paid to the appropriate insurance company; (c) the amount of all customer refunds and adjustments and pre-approved, in writing, promotional discounts; (d) any amounts written off as bad debt expense; (e) revenue from the sale of Containers as part of a long distance move program organized and managed by us; and (f) any other sale of Containers, Lifts or other assets that we have approved in advance between you and other franchisees or us. The royalties and MAF ["Marketing and Advertising Fund" fees] shall be calculated on the "Net Sales," <u>which is</u> the total revenue as shown on the "Sales by Item Summary-Complete Summary," excluding sales tax and insurance as explained above, less discounts, credit memos or adjustments and bad debt expense, and monies received as part of the cross country move program, which are distributed separately on a monthly basis and not included in this summary.

(Emphasis added.)  The provision is identical in the Coyote and Desert agreements.

The Cactus provision omits one word—the second to last "and"—but that

apparently was inadvertent, and neither side contends the omission makes a

difference.

7

The parties focus on the "which" clause. We begin our analysis there. The definition in that clause is repeated here with inserted letters A through G for use in the discussion that follows. The "which" clause says "net sales" means:

> [A] the total revenue as shown on the "Sales by Item Summary – Complete Summary," excluding [B] sales tax and [C] insurance as explained above, less [D] discounts, [E] credit memos or adjustments and [F] bad debt expense, and [G] monies received as part of the cross country move program, which are distributed separately on a monthly basis and not included in this summary.

So the clause takes this form: A, excluding B and C, less D, E and F, and G. This might more clearly be written in one of two ways. The first is this:

$$\text{Net Sales} = A - (B + C) - (D + E + F + G).$$

The second is this:

$$\text{Net Sales} = A - (B + C) - (D + E + F) + G.$$

The franchisees say the correct formula is the first, with G (cross-country revenues) one of the deductions from A (total revenue as shown on the referenced summary). PODS says the correct formula is the second, with G (cross-country revenues) added to A (total revenue as shown on the referenced summary).

One cannot know, just from reading the clause, which of these readings is correct. The clause is ambiguous. Under Florida law, when a contract is unambiguous, it must be enforced as written. But when, as here, the contract is ambiguous—when its words could reasonably be accorded two different meanings—extrinsic evidence of the parties' intent is properly considered. Both

8

sides agree with these principles, which are too well settled for argument. See,

e.g., Hurt v. Leatherby Ins. Co., 380 So. 2d 432, 434 (Fla. 1980); Emergency

Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995).

Here there is extrinsic evidence that cuts each way.  But overall, it cuts far

more strongly in favor of the franchisees.

The object of considering extrinsic evidence is to discern the parties'

intent—to give effect to the actual agreement the parties believed they were

entering, if that can be done consistently with the language the parties used in the

agreement.  On the question of the parties' intent, the extrinsic evidence is

overwhelming.  This record establishes beyond any dispute that the representatives

on both sides who negotiated these franchise agreements and attempted to commit

their agreement to writing intended to exclude cross-country revenues from the

definition of "net sales."

The primary participants in the discussions that led to these agreements were

the franchisees' principal David Alan Quarterman, the franchisees' attorney Scott

Augustine, and PODS's representative Jacquelyn Cosentino-Georges.  All testified

to the same facts; there was no dispute.  Mr. Quarterman had a copy of a franchise

agreement PODS had entered earlier with a different franchisee that excluded

cross-country revenues from "net sales."  He asked for the same treatment.  Ms.

Cosentino-Georges knew PODS had agreed to do this more than once and made

the same agreement with Mr. Quarterman.  Mr. Augustine sent an email to Ms. Cosentino-Georges confirming the status of negotiations and listing this as one of the items that would be included in the addendum PODS was preparing.  Ms. Cosentino-Georges printed the email and added her own handwritten note, "We have done this b/4," as a communication up the line, intending to head off resistance.  Ms. Cosentino-Georges testified that she ordinarily reviewed all proposed changes to franchise agreements with her supervisor and that, to the best of her knowledge, she followed that practice here.  In any event, the record gives not a hint that Mr. Quarterman or Mr. Augustine had any reason to doubt Ms. Cosentino-Georges's authority to act on behalf of PODS.  Nobody at PODS pushed back; the deal was done.

The participants decided that the best way to achieve their intended result was by editing the "which" clause quoted above.  In the standard agreement, after the terms labeled A through F above, the clause continued, "plus monies received as part of the cross country move program, which are distributed separately on a monthly basis and not included in this summary."  (Emphasis added.)  The participants decided to change "plus" to "and," apparently on the view that this made it clear that "monies received as part of the cross country move program" were part of the deduction, not an addition to "total revenue."  On that view, using

10

"and" instead of "plus" moved the last parenthesis in the formula set out above—
that is, changed the meaning from the second formula set out above to the first.

It is a curious theory.  At least ordinarily, "plus" and "and" are synonyms.
As PODS puts it, two plus two are four, just as two and two are four.  Cross-
country revenues were not large at that time, but the issue was important enough to
be discussed.  Instead of just "and," the parties easily could have said, "and also
excluding."  They also could have rewritten the entire definition—and many other
provisions—to make the entire agreement clearer.  The issue before us, though, is
not whether they could and should have said this better, but what they meant.  The
evidence is clear that what they meant—what they intended to signify by changing
"plus" to "and"—was that cross-country revenues were excluded from "net sales."

The other extrinsic evidence does not change the result.  As it turns out, the
summary referred to in the "which" clause term labeled A above, the "Sales by
Item Summary-Complete Summary," does not include cross-country revenues, so
treating them as excluded by the term labeled G is an odd formulation.  In the
absence of clear evidence of intent, this would cut against reading term G as we do.
But because the evidence of intent is so clear, the better conclusion is that this is
just another instance of bad drafting.

The agreement's first definition of "net sales"—the sentence fragment that
precedes the "which" clause—is worded differently, but if it is read to conflict with

11

the "which" clause, this merely highlights the ambiguity; a contract with two conflicting provisions is, almost by definition, ambiguous. Moreover, it is not clear that the sentence-fragment definition includes the disputed cross-country revenues at all. The fragment says "net sales" include only revenues "actually received for services and products sold <u>in connection with operations conducted by the Franchised Business</u> . . . ." (Emphasis added.) Cross-country revenues are received for operations conducted not just by the franchised business—the franchisee—but also by at least one other franchisee. The fragment does not say revenues received for services and products sold in connection with operations of "only" the franchised business, but the language can be read that way if necessary to avoid a conflict with the "which" clause and the parties' clear intent. In short, standing alone, the sentence-fragment definition might be read to include cross-country revenues, but the sentence-fragment definition did not stand alone, and it can bear a meaning consistent with the parties' clear intent.

Extrinsic evidence also includes the parties' own practical construction of their agreement. This is so because how parties contemporaneously apply an agreement sometimes shows what they meant. See <u>Danforth Orthopedic Brace & Limb, Inc. v. Fla. Health Care Plan, Inc.</u>, 750 So. 2d 774, 776 (Fla. 5th DCA 2000). Here, PODS did not begin charging royalties on cross-country revenues until September 2004, more than a year after entering the agreements with Coyote

12

and Desert, and even then, PODS set the royalty rate at just 4%. PODS explained its decision to begin charging the royalties in a memorandum to all franchisees. The memorandum casts substantial doubt on any claim that the agreements had required a 6% or 8% royalty all along:

> As all of you will recall, it has also been our position that ½ of the royalty fees, or 4% of your gross collected revenues, would be used to support the call center and was not intended to be a profit center for Corporate. However, in that same spirit, it was never intended for the call center to be such a drastic drag on earnings for Corporate either.

> Given that same spirit, the only way we will be able to grow both the general call center and corporate development center is by initiating a royalty against cross country revenues. In an effort to remain consistent and be fair, I have instructed Tom to charge a 4% royalty fee against the distributed portions of the cross country revenues. This will begin with the distribution checks written in September of 2004. After plugging this formula into our '05 budget, it appears as though the call center will have an opportunity to nearly break even for fiscal year 2005.

To be sure, the memorandum does not change the terms of the franchise agreements and is not a waiver of the position PODS now asserts. The memorandum is, however, additional extrinsic evidence supporting the construction of the agreements that we adopt.

Finally, while parties are free to enter contracts that are fair or unfair, that make good sense or seem nonsensical, an ambiguous contract can more readily be construed in a way that makes sense than in a way that does not. Here, if excluding cross-country revenues from "net sales" cut PODS out of any return on

13

that line of business, we would hesitate before reading the franchise agreements that way. In fact, though, an analysis of what made sense cuts just the other way. For local business, the franchisee handled the whole transaction and got all the revenue, reduced only by PODS's royalty and other amounts payable to PODS for things like advertising. For cross-country moves, in contrast, revenues were split one-third each to the initiating franchisee, the receiving franchisee, and PODS. So PODS received one-third of the revenue even when it charged no royalty. It thus is hardly surprising that in PODS's early days, when local operations were paramount and the cross-country business had not taken off, PODS sometimes was content with one-third of cross-country revenues and did not charge an additional royalty on the franchisee's one-third.

In any event, that is plainly what PODS agreed to do here. The district court properly granted summary judgment for the franchisees on this claim.

IV

In count 2, Coyote and Desert sought 2% rebates under § 6.4 of their franchise agreements. The section provided:

> After the 3rd Anniversary of the Commencement of opening the Franchised Business we will rebate 2% of your Net Sales during each calendar quarter, within 60 days of each calendar quarter-end, if we determine that you have received a Satisfactory or Excellent Performance Rating for your most recent audit. If you have less than a Satisfactory Performance Rating, we will audit you again within the following 6-month period. If you receive less than a Satisfactory Performance Rating from the second audit, you will

not be reviewed again until 6 months after the date of the second audit.

PODS admits that this section, by its terms, entitled Coyote and Desert to the 2% rebates. PODS says, though, that the section should have been deleted when, as part of the addendum, the base royalty rate was changed from 10% to 8%. PODS says the failure to delete the section was a scrivener's error.

The assertion fails because the representatives who negotiated the addendum on both sides have testified that they intended to retain the 2% rebate provision. There is no contrary evidence. If, unbeknownst to the franchisees, some other PODS official did not notice the agreement's actual terms, that does not change the agreement. This was not a scrivener's error; it was a deliberate decision accurately recorded in the written agreement.

V

These rulings bring us to PODS's procedural defenses. First, PODS says the claims of Coyote and Desert are barred by releases they executed in June 2007. Each release provided:

> For value received, Franchisee . . . for itself and on behalf of its affiliates (collectively the "Releasing Parties") agree to release Franchisor and all of its predecessors . . . (collectively the "Released Parties") from any and all claims and causes of action of whatever nature or kind, in law or in equity, <u>which the Releasing Parties now have or have ever had against the Released Parties</u>, including without limitation, anything arising out of (i) the Franchise Agreement, as amended from time to time through the date of this Addendum; (ii) all contracts Franchisor has entered

15

into with Franchisee ancillary to the Franchise Agreement listed in subpart (i) of this Section 3, and (iii) any other relationship between the Releasing Parties and the Released Parties. . . . <u>This release excludes any obligations Franchisor has to Franchisee accruing after the date of this release</u>. . . .

(Emphasis added.)

Properly read, and by their plain terms, the releases looked back, not forward. The franchisee released claims for alleged royalty overcharges (and anything else) through the date of the release but did not release claims based on PODS's obligation to pay amounts coming due in the future. So if PODS improperly withheld royalties on cross-country revenues in the past, or failed to credit the franchisee with a 2% rebate for satisfactory performance in the past, the franchisee could do nothing about it; any claim had been released. Even so, PODS was obligated to properly perform under the franchise agreements going forward.

Coyote and Desert have made no effort to circumvent the releases. They demanded, and the district court awarded, only amounts due for periods after the date of the releases.

PODS says, though, that the releases looked forward as well as back. To get there, PODS says, in effect, that the reference to "<u>obligations</u> . . . accruing after the date of this release" should be construed to mean "<u>claims</u> . . . accruing after the date of this release," and that when a claim accrues should be interpreted to mean when a claim accrues <u>for statute-of-limitation purposes</u>. The short answer is

16

twofold: when an "obligation" accrues is not necessarily the same as when a "claim" accrues, and the language of the releases should be given its ordinary meaning, not a technical meaning based on arcane legal principles the parties were unlikely to know or care about. See Crawford v. Barker, 64 So. 3d 1246, 1255-56 (Fla. 2011); Beans v. Chohonis, 740 So. 2d 65, 67 (Fla. 3d DCA 1999).

Moreover, even if the parties could be deemed to have intended a technical meaning, PODS's argument would still fail. When an obligation accrues is an issue ordinarily confronted in financial accounting. For that purpose an obligation accrues when the events occur that give rise to the obligation. The relevant statute-of-limitations concept is not when an obligation accrues but when a "claim" accrues—a distinction that sometimes produces a different outcome.

The Florida statute-of-limitations principles that PODS cites are wholly consistent with this analysis. Under Florida law, the limitations period for a claim on a written contract is five years. Fla. Stat. § 95.11(2)(b) (2013). The period runs from the date of the breach. When the issue is the interpretation or validity of a contractual provision, we can assume, without the necessity of deciding, that the limitations period runs from the first breach, that is, from the first application of the disputed provision. There is support for that view.

Thus, for example, in Dinerstein v. Paul Revere Life Insurance Co., 173 F.3d 826 (11th Cir. 1999), the issue was whether an insured's payments from his

17

disability insurer were properly reduced when he began receiving social-security benefits. The insured filed the lawsuit more than five years after the insurer reduced the benefits. He asserted that each reduced payment started a new five-year limitations period. We disagreed, reversing a judgment for the insured. We held that the limitations period ran from the date of the first reduced payment.

Similarly, in Garden Isles Apartments No. 3, Inc. v. Connolly, 546 So. 2d 38 (Fla. 4th DCA 1989), the issue was the validity of a rent-escalation clause in a long-term lease. The lessee filed a lawsuit challenging a recent rent escalation. But the lawsuit was filed more than five years after the first escalation under the clause. The Florida Fourth District Court of Appeal held that the action was barred, concluding that the limitations period ran from the first application of the escalation clause.

The scope of these decisions may be unclear; other decisions may point the other way. See, e.g., Holiday Furniture Factory Outlet Corp. v. Fla., Dep't of Corr., 852 So. 2d 926, 928 (Fla. 1st DCA 2003); Bishop v. Fla., Div. of Ret., 413 So. 2d 776 (Fla. 1st DCA 1982). Even assuming, though, that Dinerstein and Garden Isles apply to a franchise dispute like ours, the decisions do not help PODS, because the franchisees filed this action within five years after PODS first applied the disputed provisions. PODS gave notice in August 2004 of its intent to begin collecting royalties on cross-country revenues in September 2004. The

disputed 2% rebate provision, by its terms, became available to a franchisee three years after the franchisee began operating. Coyote and Desert became eligible in 2006 at the earliest. The franchisees filed this action on April 30, 2009, less than five years after PODS first assessed cross-country royalties or failed to make a 2% rebate.

PODS does not contend otherwise. It says, though, that Dinerstein and Garden Isles should inform the interpretation of the releases Coyote and Desert executed in June 2007. Not so. Those cases addressed when claims accrued, not when obligations accrued. The whole point of the decisions was that the statute of limitations began running when the claim at issue accrued—the claim that the defendant was improperly applying the disputed contractual provision—not when the defendant was obligated to make a disputed payment.

In any event, the meaning of these releases turns on their plain meaning, not on the intricacies of the law governing statutes of limitations. Whatever might be said of when a claim accrues for limitations purposes, there is no reason to construe these releases as foreclosing the ability of Coyote and Desert to enforce the franchise agreements going forward. Coyote and Desert gave up their claims for back payments, but they did not give up their claims to future payments.

## VI

Finally, PODS invokes the franchise agreements' notice provision:

19

> [E]xcept as otherwise prohibited or limited by applicable law, any failure, neglect, or delay by you to assert any breach or violation of any legal or equitable right arising from or in connection with this Agreement shall constitute a waiver of such right and shall preclude the exercise or enforcement of any legal or equitable remedy arising therefrom, unless written notice specifying such breach or violation is provided to us within 12 months after the later of: (a) the date of such breach or violation; or (b) the date of discovery of the facts (or the date the facts could have been discovered, using reasonable diligence) giving rise to such breach or violation.

The franchisees sent a letter giving notice of their claims in January 2008. PODS says claims for payments due more than 12 months before the date of the letter are barred. PODS apparently does not attempt to apply here its argument based on when a claim accrues under Dinerstein and Garden Isles, and PODS could not reasonably do so. By its terms, the notice requirement runs from the later of the date of the breach or violation or the date when the facts were or reasonably could have been discovered; that language cannot be read to turn on the date when a claim accrues for statute-of-limitations purposes.

The notice defense, even if valid, would not affect Coyote or Desert. Their claims go back only to July 2007 (the first month after the releases), so the January 2008 notice was timely. The notice defense thus affects, at most, Cactus's claim for a return of cross-country royalties for the period prior to January 2007.

The first issue raised by the notice defense is whether this kind of notice provision is valid at all. Cactus says the answer is no based on Florida Statutes

20

§ 95.03: "Any provision in a contract fixing the period of time within which an action arising out of the contract may be begun at a time less than that provided by the applicable statute of limitations is void." We disagree.

The statute does not invalidate the notice provision because the notice provision is not a substitute for, and does not conflict with, the statute of limitations. Quite the contrary. The notice provision required only the giving of notice—an act that could be done without the effort and expense that attends filing a lawsuit. The notice provision did not shorten the time in which Cactus could file this action; Cactus still had the full five years.

Moreover, Florida courts have enforced notice provisions in at least some circumstances. See, e.g., Bankers Ins. Co. v. Macias, 475 So. 2d 1216, 1218 (Fla. 1985) (holding that a failure to give notice as required by an insurance contract bars an insured's claim against the insurer only if the insurer suffers prejudice, that prejudice is presumed, and that an insured who fails to give notice thus cannot recover unless the insured proves lack of prejudice); Nat'l Gypsum Co. v. Travelers Indem. Co., 417 So. 2d 254 (Fla. 1982) (holding that a materialman's claim against a surety was barred by the failure to give notice within 90 days as required and that no showing of prejudice was necessary); Tuttle/White Constructors, Inc. v. State Dep't of General Servs., 371 So. 2d 1096 (Fla. 1st DCA 1979) (holding that a construction contractor's damages-for-delay claim against the

owner was barred by the failure to give notice within 20 days as required by the contract); see also Marriott Corp. v. Dasta Constr. Co., 26 F.3d 1057 (11th Cir. 1994) (holding that a construction contractor's damages-for-delay claim against the owner was barred by the failure to give notice within 7 days as required by the contract). Cactus's assertion that § 95.03 invalidates notice provisions is flatly inconsistent with these cases.

The inapplicability of § 95.03 leaves to the common law the issue of the validity and effect of notice provisions like those at issue here. Florida courts have said more than once that notice provisions must be reasonable. See, e.g., W. F. Thompson Constr. Co. v. Se. Palm Beach Cnty. Hosp. Dist., 174 So. 2d 410, 414 (Fla. 3d DCA 1965) ("A provision to give notice of default is, of course, valid provided it is reasonable.").

There is nothing inherently unreasonable about a 12-month notice provision in a franchise agreement. It is true, as Cactus asserts, that PODS has cited cases only from the construction and insurance industries. Florida courts have enforced notice provisions primarily, if not exclusively, in those fields. Still, a franchisor and franchisee have an ongoing relationship. They deal with one another not just on a finite project but on a continuing basis. Any disagreement—any potential claim—may look not only back but forward. It makes sense to require notice so that a disagreement can be resolved promptly—so that any default can be cured

22

before damages mount up unnecessarily.  We thus assume that a notice provision in a franchise agreement may be valid.

That does not, however, resolve the matter.  The next issue is this: what consequence flows from a franchisee's failure to give timely notice?  That a requirement to give notice is reasonable does not mean it is reasonable to insist that a claim is foreclosed even when there is no prejudice.

Here the franchise agreement says that, "except as otherwise prohibited or limited by applicable law," the failure to give notice waives the claim.  The better view is that the applicable Florida law imposes this limit: a claim is waived only if the failure to give notice prejudices the opposing party.  Florida law imposes this limit in the insurance context; that was the Florida Supreme Court's square holding in Macias.  The court did not impose a prejudice requirement in National Gypsum, but the court said its holding was limited to surety contracts in the construction industry, where notice requirements are widespread and well known.  Extending the holding to franchising would run counter to National Gypsum and would not square with its rationale.

A more detailed review of National Gypsum confirms this conclusion.  We start in the lower court.  In Travelers Indemnity Co. v. National Gypsum Co., 394 So. 2d 481 (Fla. 3d DCA 1981), the court held 2–1 that a materialman's claim against a surety was barred by the failure to give notice, even in the absence of

23

prejudice.  The three judges all wrote separately; no opinion garnered more than one vote.

Judge Nesbitt, writing for himself alone, would have enforced the notice provision because parties may contract as they please and thus may provide that a claim is foreclosed unless notice is given—a rationale that would reach the franchise agreement here.

Judge Schwartz concurred in the result on much narrower grounds.  He acknowledged that for insurance policies in general, a failure to give notice precludes recovery only if the insurer suffers prejudice.  But he said that notice provisions are common in the construction industry and that a lack of prejudice should not allow recovery on a construction-industry surety bond.  Id. at 485 (Schwartz, J., concurring specially).

Judge Hendry dissented, citing insurance cases and concluding that a notice provision should be enforced only when there is prejudice.

On review, the Florida Supreme Court explicitly embraced Judge Schwartz's view: "We find that Judge Schwartz's special concurrence sets out the proper rule which best preserves the rights and expectations of the parties."  Nat'l Gypsum, 417 So. 2d at 256.  This was a clear repudiation of Judge Nesbitt's view that notice provisions can be enforced outside the construction field without regard to prejudice.

24

Judge Nesbitt's opinion was the only one that, if applied to the case at bar, would allow PODS to enforce the notice provision without regard to prejudice. But the Supreme Court rejected that view. The only fair reading of National Gypsum is that any valid notice provision in a contract other than a construction-industry surety bond can be enforced only when the failure to give notice causes prejudice to the opposing party.

Here there was no prejudice. In many circumstances, a timely notice may lead the defaulting party to change course. That is the primary purpose of a notice provision in a franchise agreement. (If the primary purpose was instead to foreclose claims, we would revisit our analysis of § 95.03, the statute precluding contractual provisions shortening a statute of limitations.) But here the only thing PODS could have done upon receiving an earlier notice was not to charge cross-country royalty fees—in substance, to pay Cactus then what the judgment requires PODS to pay now. Enforcing the notice provision would give PODS an undeserved windfall.

The notice provision does not foreclose these claims.

VII

For these reasons, the judgment is affirmed.

25